No. 3103.—State ex rel. Samuel Smith & Co. *v.* Antoine Dubuclet, State Treasurer.

A warrant, issued by the Auditor of Public Accounts in favor of a creditor of the State on the State Treasurer for money due, is not a bill of credit, nor is it such a negotiable instrument as entitles the holder to the protection of the law merchant. An innocent third holder of such paper can not therefore claim the protection of the law merchant against the charge by the State itself that such warrant was obtained through error and fraudulent practices by the original holder on the Auditor of Public Accounts. Nor can the third holder invoke the doctrine of estoppel against the State on the ground that the Auditor, as the fiscal agent of the State, having recognized the validity of the claim and given the warrant of the State therefor, the State was estopped from inquiring whether the consideration for which it was given was good and valid or not.

APPEAL from Eighth District Court, parish of Orleans. *Dibble,* J. *Lea, Finney & Miller,* for relators and appellees. *S. Belden,* Attorney General, and *John H. New,* for defendant and appellant.

Taliaferro, J. The plaintiffs proceed against the State Treasurer by mandamus to compel him to pay a certain State warrant for $12,120, which they hold as transferrees of one Isaacs, to whom the warrant was issued.

In answer to a rule *nisi,* the Treasurer answered, that at the time the warrant was presented for payment, there were no funds in the treasury wherewith to pay it. That before the warrant was presented he was instructed by the State Auditor not to pay it, as it had been issued through error upon counterfeit coupons of bonds of the State of Louisiana, and had no legal force. That he can only pay out money upon

the order of the Auditor; and, as in this case, when his authority to pay is revoked, he is without power legally to perform the act. The rule was made absolute and the treasurer ordered to pay to the relators the amount of the warrant, and that he pay costs of the proceedings. An appeal from this judgment was taken on the part of the State. It is established clearly that through the fraud and knavery of Isaacs, practiced upon the Auditor, he, through error, issued the warrant upon State bond interest coupons proved to be spurious and forged instruments. The relators, who are bankers and dealers in money, purchased the warrant from Isaacs, and contend that as they acquired ownership of the warrant in good faith and for a valuable consideration, the State is bound to pay them the amount called for by the warrant, whatever may have been the circumstances under which it was issued. They aim to assume the position of innocent third holders, and invoke the principles of the commercial law to protect them. They seem, however, to rely mainly on the doctrine of estoppel. They insist that the warrant having been issued by the properly authorized officer of the State, and being an order by the State through its proper agent for the payment of a sum of money to the payee or to his order, the State thereby acknowledged its obligation to pay the specified sum ; and having put the instrument into circulation as a negotiable one, the State is estopped as to the relators, holders in good faith for a valuable consideration, from setting up error and fraud to vitiate and repudiate the act. We are referred to various authorities as sustaining these positions.

We see no sufficient reason for ascribing to the instrument in question the character of commercial paper under the law merchant. True, it is payable to Isaacs or order, but this single feature of a negotiable instrument does not, we apprehend, clothe the third holders of this warrant with all the special rights and immunities which, on grounds of policy and in the interests of commerce, they would be entitled to under the commercial law as bona fide holders of a promissory note or a bill of exchange. The warrant simply authorizes the treasurer to pay Isaacs or order a certain sum for certain coupons of interest presented by him for payment. It is not of the nature of a bill of credit. It was not designed to circulate as a commercial security. It was obtained by imposition and fraud of a criminal character, commenced by the perpetration of an infamous crime. It was given in good faith towards the payment of a public debt. It proved to be utterly without consideration. It was essentially null and void when in the possession of Isaacs. It fell to ashes in his hands. Could it become anything better in the hands of a subsequent holder? Could Isaacs give it life and force by transferring it? Considerations of the public welfare and of public order seem to answer these questions in the

negative. The strongest case cited by the council of the relators, and the one most relied upon by them as authority on the subject of estoppel, is that of Moran v. Miama County, found in 2 Black's Reports, p. 723.

In that case the question was whether the county was liable upon coupons which it was alleged in defense, the county had no right to issue. We agree that the county after receiving the money for its bonds was very justly estopped from setting up its want of right to issue the bonds or the coupons when called upon to pay them. But what did the State of Louisiana receive for the warrant issued to Isaacs? Was it the supposed credit for $12,120 it expected to have on its public debt for coupons? Certainly not. The State was not benefited one cent by issuing the warrant. There is then no analogy between the two cases. Is the State powerless to protect itself from so shameless a fraud? Because through imposition successfully practised upon the Auditor, he stated that the State owed the amount expressed by the warrant, shall it be estopped from declaring and proving the fraud, and from alleging that on that account it does not owe the sum claimed.

On the other hand, the alleged equitable claims of the relators do not appear on examination to be as strong as represented. It is part of the history of the period during which they acquired this warrant, and it was a matter of public notoriety that extensive frauds had been committed upon the fiscal department of the State government, and that the predecessor of the present incumbent of the Auditor's office was complicated with those frauds.

A state of things existed which was well calculated to render dealers in securities of that kind cautious. It was a matter of no surprise during this state of uncertainty and doubt, when it was ascertained that large quantities of spurious coupons had been manufactured, and that the fraudulent act by which the warrant was obtained had been accomplished. The testimony of Levy, a broker of the city, is significant in regard to the suspicion that arose in his mind with respect to this warrant, while it was in the hands of Isaacs. Levy undertook to sell the warrant for Isaacs, but afterwards declined having anything to do with it, because as he states, "the manner of the man and his anxiety to sell the warrant below the market rate awakened my suspicions." Very soon afterwards one of the relators, Kelshaw, bought the warrant. In his testimony he said on cross-examination: "I have not been in the habit before purchasing warrants of going to Mr. Graham in order to inquire into the validity of warrants. Mr. Smith, the senior of the firm, did. I have done so since I bought this warrant about four points below the market prices."

Under all the circumstances and the surroundings of the transaction

State ex rel. Smith & Co. v. Dubuclet, State Treasurer.

by which the relators became the owners of the warrant, we can scarcely think they exercised the degree of circumspection and care that ought to be expected from prudent men.

There are four bills of exceptions in the record. Three of them relate to evidence introduced by the defendant to establish the spurious character of the interest coupons. As these instruments were subsequently admitted to be forgeries, it becomes unnecessary to examine the bills of exception taken on the admission of the evidence. The other bill of exceptions is to the admission of the testimony of Levy as to what passed between him and Isaacs in regard to the warrant. The relators objecting that this was *res inter alios*. The objection was properly overruled. The evidence went to show that the warrant was hawked about for sale under suspicious circumstances, a fact which the defendant had, under the pleadings, a right to show.

We conclude that the relators should not be allowed to recover.

It is therefore ordered, adjudged and decreed that the judgment of the district court be annulled, avoided and reversed. It is further ordered that the rule taken by relators be dismissed at their costs in both courts.

HOWE, J., *concurring*. I concur, on the grounds that, *first*, there were no funds in the treasury at the time of the demand made by relators, and therefore no right in them to the summary remedy of mandamus; and *second*, that, under the circumstances of this case to allow the mandamus to issue would be practically to permit a citizen to sue the State, without her permission, upon a disputed claim.

Rehearing refused.